Welcome to the Fifth Circuit Court of Appeals. We have three cases to be submitted today on oral argument. And we begin with United States v. Theiler. Mr. Hellman. Is Theiler the correct pronunciation? Or is it Theiler? I believe it's Theiler. And I'm Matthew Hellman on behalf of Ms. Hertzberg. Going first. Yeah. All right. Thank you, and may it please the Court. As I said, I'm Matthew Hellman, here on behalf of Appellant Susan Hertzberg. This Court should reverse Ms. Hertzberg's conviction because the government did not prove that she agreed to conspire. Indeed, the undisputed evidence here, which is extraordinary, shows just the opposite. Well, she did at various times express some question about the propriety of what was going on, did she not? She made some inquiries. I mean, she actually reassigned somebody who might have had inside knowledge. Those points, her inquiries show why a rational fact finder here could not find guilt. When Ms. Shore, a non-conspirator who Ms. Hertzberg appointed to oversee the hospital operations and assess the Little River business model, said to Ms. Hertzberg, I'd like to understand this more, Ms. Hertzberg says, go to Texas and go to find out. And what does Ms. Shore conclude? That Little River has a sound business model, and that Boston Hearts should expand. Let me step back. This was a seven-week trial where eight conspirators testified for the government. Eight conspirators. Not one of them said that Ms. Hertzberg was involved. Not on the stand, and not in the thousands of documents that were produced in this case. Instead, what the conspirators said was that they hid the conspiracy from Ms. Hertzberg, that they would have been fired if she had found out. Tell us about the reassignment of the whistleblower. What happened with that, and what was her involvement? Yes, happy to, Your Honor. Ivers is the person in question. Before Ivers blew the whistle, before Ivers blew the whistle, he asked Ms. Hertzberg to be reassigned. When he blew the whistle, he alerted Ms. Hertzberg, who by that point no longer had authority over compliance, because she had given notice of her resignation. And he also notified Rossi, head of compliance for the company, who immediately opened an investigation. So Hertzberg, not in charge of compliance at that point. Rossi immediately opened an investigation. Ivers, already having asked to be reassigned, Ms. Hertzberg grants his wish to be reassigned. Grants his wish. And again, this is a case like Ganji, like Nora. Actually, it's stronger than that. Because the government argued in this case that you knew the conspirators were guilty because they hid the doctor payments from Ms. Hertzberg. The government argued in closing that Krauss, a conspirator here, was guilty because he hid the key guilty conduct, payments to physicians, from Ms. Hertzberg. Can't have it both ways. And then a third point here is one I've alluded to already a little bit, which is that Ms. Hertzberg put in place experienced professionals who no one here contends, no one here contends were conspirators, to oversee compliance and hospital operations. And what they told her, after she empowered them to investigate, after the conspirators lied to them, just like they lied to Ms. Hertzberg, what they told her was that the business model was sound, there should be an expansion, and that there was nothing wrong with the MSO use in the case. Now, where does that leave the government? That leaves the government saying you can infer guilt because she was the boss. Guilt by CEO is not a valid theory of conviction in this circuit. The court said as much in the Ganji case. Should have known is not a criminal conspiracy standard. There is a negligence suit brought by the government against Ms. Hertzberg right now seeking millions of dollars. That's a should have known standard. And that will be litigated separately. But we're here on a criminal conviction, criminal conspiracy, where it has all the hallmarks of those cases, Nora and Ganji being the two leading ones, where there is not the evidence that she agreed. And, in fact, the evidence points to the contrary. How can it be that the conspirators are hiding doctor payments from her when she's part of the conspiracy? How can it be that the conspirators are fearing that they'll be fired if she finds out? You cannot complete the sentence with those facts and say a rational fact finder could conclude guilt beyond a reasonable doubt. I think the other thing the government does in this case, if I may, is to say, well, there were times when Ms. Hertzberg did pass on information about financials to others in the company. I think it's telling, telling that that is the kind of argument the government makes in this case. Because in every instance where they say she didn't pass something on, she passed it on repeatedly in other emails, other reports. Everyone understood the financials in this case, the head of compliance, the head of hospitals, the board, the general counsel. We give lots of sites about this on page 15 to 16 of our opening brief and pages 45 to 49 to 42 of the record. You can't say, you cannot infer guilt from not, over the course of some months, not passing on information to time A if you pass it on to time B, C, D, E, F, G, H, I, J, K, L, M. It goes on. She passed it on to everyone. So the government's two arguments here, she's the boss, she must have known. That belongs in the negligence case, not in this court. And as for the not passing on information, everyone understood what Ms. Hertzberg understood. Many of those people were not conspirators. And I'll save my time for rebuttal unless the court has further questions. But we would ask the court to reverse. Yes, thank you. Mr. Pell, would you save time for rebuttal? Thank you, Your Honor. Mr. Gosar? Thank you, Your Honor, and may it please the court. I represent Matt Tyler, the VP of sales, who is essentially convicted for being the VP of sales. The government's entire case was premised on rent speculation and conjecture. There was zero direct evidence of wrongdoing. The government focused on legitimate activities in the ordinary course of business, each with a facially legitimate objective. Tyler supervised the sales team. He met with important corporate clients. It just so happens that that sales team and those clients were secretly engaged in this conspiracy. No rational juror beyond a reasonable doubt could look at evidence equally consistent with valid business activity and presume the conspiracy with no direct evidence of any wrongdoing and no basis, and this is critical, for excluding the innocent exploration. The government's entire case ultimately turns on three buckets of evidence, and each is equally meritorious. It first targeted that ordinary corporate activity, which is exactly what you'd expect to see from any competent executive. This is the role of the VP of sales. He is going to meet with important corporate clients. He will supervise his sales team. He will visit Texas, if that's part of his purview. Nothing about meeting with those clients and those members of his sales team suggests anything of variance, especially if those entities and those people are the ones that are actually driving the conspiracy. As the government, I think, effectively admits, this was a bottom-up conspiracy at best. You know, one of the difficulties in overhanging this case is just following the cost of the services. You know, you follow the money, and what jumps out at you is that when the government has picked up the task, which is what was happening here, the cost went way up. That's very difficult. Well, Your Honor, I think there are two elements. I'd like to explain two parts of that. The first part of cost in economics is I think you look to see that Tyler didn't receive a single penny from this conspiracy. The actual conspirators were directly paid. So I think that's a pretty strong indication. Someone doesn't join a conspiracy in the twilight of their career when they're doing well to make no money. That's not a rational connection. Now, the other part of the cost is that is not part of the conspiracy allegations in this case. These are allegations that are sprinkled throughout the indictment. They were raised at different parts of the case, suggesting that this rural hospital was using its higher reimbursement rates in an unfair way. That is not part of the conspiracy allegations here. That was deemed legitimate conduct, and I appreciate Your Honor has concerns about that, but then the government should have brought a different case. I'm suggesting to you this is a background to all of this activity moving back and forth, Livermore, et cetera. Are they hard hospitals? What has going on? You can't injure the class and act over it. I hope a lot of money is not actually picking it up, but it only happens because, ultimately, it's the government that's going to have to pay the tab. Well, Your Honor, I think that was actually in the background of the case. I think that's one of the reasons that the jury here may have been upset and may have convicted people despite the lack of any actual evidence engaged in any wrongdoing. So, again, it's not supply and demand of the market. And, Your Honor, if that were this case and we'd be having a very different conversation, we would have briefed the case in a very different way. The district court found there was absolutely nothing wrong. We can debate the policy of this, the Congress reimbursing rural hospitals that are running tests through that hospital. That is not the allegation here. The allegation here is one of kickbacks. And the kickbacks... I'm sorry, Your Honor. Well, the kickbacks, too, these were run through the local team. They kept them hidden from the corporate executives. They conceded they did that on purpose because they'd be fired if they disclosed this to their bosses. So it's very little surprise that the local sales team would not mention any kickbacks. When you look at the government's attempts to tie Tyler to this, for his visits to Texas, they have very nefarious suggestions, like looking down at this hospital. He talked to these different people. But when you read the actual testimony, the known... This is a cooperating witness who's engaged in the conspiracy. They would know. They said there was no discussion of kickbacks at those meetings. The meeting with Integrity Hospital lasted 45 to 60 minutes. These are other people present. This is not the kind of allegation that you would expect to see for someone who's actually meeting with these people to construct a conspiracy, as opposed to meeting with them because these are important corporate clients. And this is part of the job purview of someone who's the DP of sales. I think if you also look at the government's evidence, you can break it down on a granular detail. I'm going to try to do an outbrief. If the court has any concerns with any individual piece of evidence, I'd love the chance to discuss it, because each has a patiently legitimate objective. In almost every instance when the government really says this was a bad phone call, this shows this is the opportunity to conspire, there was a chance where they had someone like Joanna Shaw was on the phone with Mr. Tyler. But the government doesn't have to disprove every possible legitimate explanation. No. They don't need to disprove every possible inference, but they do need to provide a rational basis where a juror, beyond a reasonable doubt, could say, I see a piece of evidence and has two possible ways to do this. They need some rational way to choose one over the other. And in this case, there is no such dividing factor. There's nothing that suggests that any individual piece of evidence should be ready to support a conspiracy. The government effectively is reasoning backwards. They look and they say, let's say that Tyler wasn't on it. Hey, he had a phone call with the guy who was in charge of the bad MSO. So that phone call must have discussed the conspiracy instead of discussing legitimate corporate activity. And MSOs, by the way, are legitimate entities. There's nothing wrong with an MSO. They don't need to just provide administrative services. They can recruit physicians for a hospital. What they can't do is pay a physician to give tests to the hospital. That's the critical legal point. And I think the government conflates this constantly. They even take evidence from someone like Jeff Parnell, who said that it was well known that doctors were investing in MSOs. There's nothing wrong with a doctor investing with an MSO, as long as their return is based on the investment. And their return is not based on referring the individual kickbacks. I see I'm into my rebuttal time. So unless the court has further questions. Thank you, Mr. Dodd. Thank you. Mr. Coburn? Good morning, Your Honor, as I may appease the court. My name is Alicia Coburn, and I represent Thomas Gray Hardaway. Mr. Hardaway's conviction cannot stand for a simple reason. The government did not prove that Mr. Hardaway knew that the MSO payments were illegal kickbacks for referral of federally reimbursable tests. At most, the evidence shows that Mr. Hardaway knew that MSOs existed, that MSOs can be used lawfully, and that Little River did business through them. But that is not enough. The statute required proof that he knew the payments were intended to induce referrals and that those referrals could be paid by a federal health care program. The government failed on both points. First, there was no sufficient evidence that Mr. Hardaway knew the payments were intended to induce referrals. Mr. Hardaway was a Boston Heart salesperson in San Antonio and Austin. The two MSOs the government focused on here, at spend and next level, operated primarily in Dallas and Houston. And he was not involved in their payments, and he was not included in the discussions between those running those MSOs and the referring doctors. The government's own case agent testified here that he found no communications between Mr. Hardaway and the operators of those MSOs. The doctors who testified did not tie him to those payment discussions. In fact, three doctors testified at trial. Two of them did not even know who Mr. Hardaway was, and the other one was not involved in MSOs altogether. He was on the email thread that laid out how this business model really worked. Yes, that's true, Your Honor, but nothing in that email thread or the executive summary that was involved there reflected any illegal conduct, as Jeffrey Parnell testified. It simply laid out the MSO model, and the agent and the government's own expert testified that MSOs can be operated entirely legally. I mean, that was clear, and that's a lot of what this case is about. The government's case, at least with respect to Mr. Hardaway, was that MSOs somehow equal or equivalent to guilt. And, you know, that is where the government fell short here. And in many ways, this case is like this court's case in Marchetti. In Marchetti, this court said that the government dropped the ball when it failed to show how the defendant interacted with the relevant decision makers. So the issue here is what did Mr. Hardaway know about the contact that was going on between the MSO operators and the referring doctors? There, here, the government, just like in Marchetti, the government didn't have any evidence on that point. The government proved at most that others may have had improper intent, but it did not prove that Mr. Hardaway knew it. The government attempts to fill the gap with Marioni's testimony. Marioni was one of the operators of the criminal MSOs. But Marioni admitted that he did not regularly communicate with Mr. Hardaway, and that when they did speak, it was about ordinary lab math. His testimony about Mr. Hardaway was speculation, not forced hand proof, and was entirely contradicted by all the other evidence in the record. But he got higher commissions from the Little River referrals because he was probably the most active person in terms of setting up the relationship with Little River. Well, I think the evidence on that point, Judge Smith, was that he did get higher sales commissions, and there's nothing illegal about getting higher sales commissions. The reason why he got higher sales commissions is because the evidence was that he introduced Little River to Boston Heart. But again, there's nothing wrong with that. That's his job as a salesperson. I mean, the government points to that as somehow evidence of guilt, but it's not. It's simply part of his job. If I can just turn to the second point on the sufficiency that we make, which is Shaw. And this is an important point. Under Shaw, the government was required to prove that Mr. Hardaway had knowledge of the federal nexus here, meaning that the government was required to prove that the referrals here could be paid by a federal health care program, and that Mr. Hardaway knew it. But there was no evidence in the record of this point. There was not. Mr. Hardaway knew that federal samples were being sent by doctors. But the contrast between the MSOs and Little River, and all of the testimony in the record is consistent with it, is that no payments were made on those federal samples. And this is a world away from Shaw, where Shaw, there was clear evidence. Let me just throw out these numbers for you. The Boston Hearts annualized revenue from its partnership with Little River reached $4.4 million in June of 2015, $12 million by July, $20 million by September. Now, the average reimbursement per test under the agreement had more than doubled by September from $400 to $942. Now, who's picking up the tab for that? Your Honor, the government cites that as evidence, but the reality is there's no evidence in the record, first of all, that Mr. Hardaway knew those amounts of reimbursements. And even if he did, it's still not evidence of his guilt. The issue here is his knowledge that these were kickbacks, that they were intended. That is the fundamental aspect of the AKS, is knowledge of inducement. And Mr. Hardaway was far removed from that. Again, that's what makes this case so different from Marchetti. In Marchetti, you had a situation where the doctors themselves obviously knew why they were sending referrals. Mr. Hardaway was neither the referrer nor the payer. He wasn't a marketer. He was a lab salesman whose job it was to instruct doctors, tell them about the test and to try to get doctors interested in Boston Heart's test. And with that, I'll save the remainder of my time. Thank you, Mr. Kilgore. Mr. Ansley. Take all the time you need to get it just right. Yes, sir. Thank you, Your Honor. So I've heard that in the Supreme Court they have a crank, and it's a big deal for you. Maybe we should install one. It's on GSA. Too ticky for a lawyer. I'm surprised I haven't broken that. Good morning. May it please the Court. My name is Jeff Ansley, and I represent Appellate David Krause in this case. The trial court received a jury note that warned that a juror would hang this jury, and that his moral compass prevented him to deliberate with an open mind. And that note was not given to Mr. Krause or the other parties until after the jury had reached his verdict. He was not told that note existed until after the verdict. Was the issue about the jury notes properly and timely raised? I believe it was, Your Honor. We learned about it. Of course, the note was delivered to the court approximately 24 hours before the parties were advised it existed. The parties were told that the note's content was, the court's terms were very similar to the previous note. This is note four. Speaking about Judge, the previous note was note three. The court advised us that the notes were very similar and stated that his disclosure was essentially, was not essentially, was for the record. So it was a perfunctory disclosure immediately before the jury came back in to render their verdict. The jury was there. The jury was literally waiting in the jury room to come out when the court advised us of the existence of this note. Had we known at that time, Your Honor, what the content of that note was, then we would have objected at that time. We would have asked for more details at that time. But one, it was after the verdicts had been rendered and reached by the jury, and we were told that the note was something that, at the end of the day, it was not. The note raises something that was very different from what note three raised. They shared a commonality in that both notes concerned juror number 12. That's where the commonality, Your Honor, ends. The note, note three, said that juror number 12 is having a hard time following the court's instructions and based on the evidence before it. We agreed to an instruction, to a supplemental instruction, based on the content of that note, whereas note four, which we did not know about at the time, said that the juror would hang this jury, and that was in quotes, will hang this jury, is what he advised the foreperson, and that his moral compass prevented him to deliberate with an open mind. That was something that was a juror in crisis, and his information did, if there are, I don't know that there are more archetypical terms that would call for an out on charge at that time, had we known about that note, and yet we did not. Why wouldn't note three be an adequate response to that? I'm sorry, sir? Why wouldn't note three, to the jury, to the judge, be an adequate response to that, to that juror? Yes, Your Honor, under Bass, that amounted to a coerced jury. Under Bass, what that note did, at least in our case, that note told the jury to continue deliberating, and in fact, the terms of the note are even more exacerbating than the terms that this court found improper in Bass. In Bass, the jury was instructed to continue deliberating on any counts in which the jury may be hung. Counts which the jury does not have an unanimous agreement, continue deliberating. In our case, the jury was instructed to continue deliberating at your leisure for as long as it may take until you've reached unanimous verdicts. That's something that, under Bass, after the court received the note saying that a juror will hang this jury, that was an improper instruction under Bass. And I'm going to emphasize the importance is, because I do believe the court responded to note 4, and the importance is not the form, but the substance. And the importance is what the jury knew at the time that it received the response to note 3. What the jury knew is it had given note 3 to the court, it had given note 4 to the court 35 minutes later, a much more focused, direct, crisis-ridden note in note 4, and then afterwards, the court gave a response. A reasonable juror would only interpret that response to be a response to note 3 and note 4. And that being the case, the response given, without us knowing it, was improper under Bass because it resulted in giving one half with an Allen charge and therefore resulted in a court-ordered verdict. Back to my earlier question about objection. My notes here indicate that Crouse and Hardaway failed to object to the notes in the district court. When and where will we find that your client objected? Nobody objected to the response to note 3. Is that what the court's referring to? Any of the notes. We learned the actual content of notes for Your Honor when they referred to hanging the jury. The day after the verdict, when the court staff provided all the notes to the parties, that's when we learned what the actual content of note 4 was. So it was after the jury had been discharged. So at that time, nobody could object to the content of note 4. And when you reassembled and note 4 was disclosed to you, I guess the next morning, what was the nature of the district court's description of it? It was... I'm trying to remember what the court staff said. We received those notes by email and the court staff, I believe, advised the parties that the court did not respond to note 4. I'm sorry. The question was probably imprecise. What I meant is that note 4 comes in in the afternoon. Note 4 comes in in the morning on... I think about 11.30 in the morning on the 29th is when it was received by the court. And when does the court tell you about note 4? The next day, November 30th, 11 o'clock, so almost 24 hours later. But obviously you haven't seen the note on November 30th. What was the nature of the district court's explanation of note 4 on the 30th? Oh, I'm sorry. The court advised the parties, as we were waiting for one of the parties to... We were in the courtroom waiting for one of the parties to arrive. The court said, and I'm paraphrasing, but closely, for the record, the court received another note from the jury. The court mentioned what numbers they were, but another note from the jury that it concerned the same topic as the previous note, note 3, and that the court, they were very similar. Therefore, the court did not respond. Bring in the jury. That was a disclosure that we received. In your view, why does note 4 not simply explain the basis of note 3? So note 3 says juror 12 is unwilling to change his mind, and then note 4 says basically the explanation for why juror 12 was unwilling to change his mind, namely the moral compass. Why are they not intimately connected? Well, they're certainly connected, Your Honor, but they're connected in a way that, you know, a procedure is connected with a diagnosis. They're very different in that the substance is different, even though topically they're similar. The difference is that this statement, this juror, and I can't overemphasize the word used, will hang this jury. This juror will hang this jury, and that is far beyond the same subject matter but far beyond the actual content of what was disclosed in note 3. I see my time's up. Are there any further questions? Thank you. You and the other appellants have saved time for the bundle. Thank you, Mr. Ansley. Thank you, Your Honor. Mr. Osterhager. Good morning, Your Honor. May it please the court, Stephen A. Stryker, on behalf of the United States. Just to start with Hertzberg and Tyler's sufficiency claims. I think the first thing to note about that, they say, I think Mr. Tyler's counsel said, we're reasoning backward from guilt. I think we're starting with a guilty verdict and expecting the defendants to meet the standard of review. The standard of review requires under Moreno-Gonzalez that the defendants prove that the jury was irrational in reaching this result and under Sanders that's a preposterous or absurd result. I don't think the defendants have met that standard. Starting with Ms. Hertzberg, she says she appointed Schor to go to Texas to look at the business model down there. What Joanna Schor testified to, however, was that she did not go down there with an intent or with a purpose of looking at the legality of this relationship. And in fact, Judge Higginbotham, you referred to the inflated revenue numbers. Joanna Schor, unlike other executives at Boston Park, was not particularly excited about those numbers. She was concerned about those numbers. Or I think her words were, she was confused and curious about them. Now, Susan Hertzberg was familiar with those same numbers as was Matt and Tyler. Ms. Hertzberg's counsel referred to the Jonathan Norex case. In Marchetti, this court mentioned that even Vincent Marchetti was no Jonathan Norex. Jonathan Norex was a low-level data entry guy. He did see some of the payments there, but simply didn't understand the significance. In this case, Ms. Hertzberg was the dynamic, intelligent, involved CEO of a lab company. She, in 2011, unlike, for example, Jonathan Norex, unlike Andy Flynn, unlike Joanna Schor, in 2011, she reported to the Department of Justice about HDL, a similar lab, a competitor lab, to Boston Park that was generating inflated test records. How were they doing it? They were paying marketers to pay physicians handling fees. And it was causing two and three times the amount of the normal test amount. So Ms. Hertzberg had noticed that this sort of practice was violative of the law. And in this case, she heard from Laura Howard, for example, that MSOs in Texas were influencing physicians. She heard from David Krause's presentation that MSOs were recruiting physicians. Interestingly, to us, the Krause presentation, when Ms. Hertzberg interrupts the Krause presentation, that's a dramatic and important moment in the scheme. She cuts him off, and she says, this isn't who we are. Well, her cover for that was, this isn't who we are, was that David Krause was presenting something about sales rather than the clinical result. But David Krause was a salesman. Why wouldn't he talk about sales? In the wake of this, within a week of this, David Krause sends an email to Matt Tylan and says, I'm sorry if this hit you. I apologize. This cast a big shadow over my region. Why would it cast a big shadow over his region if the reason was that he accidentally talked about sales rather than something clinical? So the much better explanation, and certainly not the only rational explanation, was that Susan Hertzberg interrupted Krause because he was getting too close to describing the scheme when he was talking about recruitment of physicians and MSOs providing leads to Boston Heart sales labs. Also in the wake of the Krause presentation was this November 13 email from Joanna Schor, where she recommends standing down all hospitals in David Krause's region. Now, that email was about Little River and Joanna Schor's concerns about Little River. Ms. Hertzberg, in a reply brief, says that this was not a recommendation to stand down on Little River. It was just about new hospitals. But Joanna Schor's concerns were about Little River and how Little River was targeting physicians outside of Little River's geographic area. So explain to us specifically what it is about the recruitment of physicians that makes it illegal, as charged in this case. So the underlying scheme and the conspiracy that no one disputes existed was that the MSOs were just paying off physicians and pretending that they were a return on investment. So for example, one of the doctors who testified in this, Dr. Salinas, testified that he bought two quote unquote shares for $500 each. So he had invested $1,000. But month after month, he's getting payments from MSOs to order Boston Heart's tests through Little River. And then he continued that practice onward with Stanford. So the question is, so here we have this undisputed, I don't think any of the defendants dispute that that existed, that practice existed. The question is, what did they know about it? And I think piece after piece of evidence, both affirmative concealment. For example, if Susan Hertzberg had brought in Joanna Schor to vet this relationship, why remove Joanna Schor from the revenue emails that report this revenue from the Little River deal? So there are various examples of that. Both Schor and, excuse me, both Susan Hertzberg and Matthew Tyler knew that some of these physicians who were ordering tests were not neurologists and psychiatrists. Now, Boston Heart's tests were not your just broad spectrum blood tests. They were advanced lipid tests that were testing cardiac risk. It was about heart disease, diabetes. Neurologists and psychiatrists had no reason to order these tests, except maybe perhaps they were paid off. Maybe that would occur to somebody like Susan Hertzberg who had seen this practice, not necessarily involving neurologists or psychiatrists, to be clear, but a practice like this at HDL in 2011. The Ira's email, I think, is informative looking backward about what the defendants knew, and Susan Hertzberg in particular, what she knew. And we've said, how would an innocent CEO react to various things? If Susan Hertzberg did not know about this scheme all along, what would she have done at various points? This is not a negligent standard. We're simply relying on cases like Willett and Hessen that we've cited in our brief. Those cases are about when a defendant, or when a person in a position of authority, somebody like the VP of sales, somebody like the CEO, if they are able to do something about a scheme that's occurring right under their noses, not with one hospital, not with two, but with three, if they continue onward with the same approving, at least tacitly approving these deals. And in Mr. Tyler's case, and I'll get to Mr. Tyler in just one moment, in Mr. Tyler's case, affirmatively helping it to expand to Stanford, if they do that, it can be inferred that there is, when an employee reports malfeasance to them and they do nothing about it, it can be inferred that they know about it, and they're OK with it, and they're participating. For Mr. Tyler, I think the case is even more direct as to Mr. Tyler. So he mentioned the evidence that has a facially legitimate, innocent explanation. For one thing, we think that's kind of this divide and conquer analysis. That's not appropriate. It's not appropriate in the sufficiency context or the Fourth Amendment context. What do you reasonably infer from a series of pieces of evidence? Well, if you look at, for example, Parnell's testimony, Matthew Tyler told him not once, but twice, don't send me emails about MSOs. Why not? I mean, what's the legitimate explanation for don't send me emails about MSOs? There may be some that don't occur to me, but whatever that explanation might be, it makes a lot less sense when you compare it with the other evidence. Mr. Tyler knows from David Krause in the fall of 2015 that Little Rivers MSOs were performing no management services. So MSO stands for Management Services Organization. The MSOs were performing no management services. What exactly were they doing? So the defendants, their argument at trial was, well, we thought they were marketing. We thought that Little River was paying the MSOs to market. And the thing that they were marketing was that Little River provided an in-network solution so that people who could not order Boston Heart's tests directly from Boston Heart could order, and they'd be out of network. They could order from Little River in-network. But what didn't make any sense was all you would have to do is tell a physician one time, you can order Boston Heart's tests through Little River. It would be in-network. Why do you need to tell them that month after month, week after week, sometimes day after day? Laura Howard testified that she was in, I don't know if it was Dr. Salinas's office or various other high-volume physicians, but these high-volume physicians, she would visit them regularly. Why? Part of the reason could be because she was trying to make sure they stay on board. The physicians were in high demand. There was competition for them. So Tyler, the other evidence after Mr. Tyler's mens rea, he believed that people were speaking way too openly about Little River within Boston Heart. And then I think Mr. Tyler makes this perfectly, and by the way, we think all of these are jury arguments. The jury could certainly credit some of the explanations that the defendants offer. They could even acquit them, but they didn't have to acquit them. And I think one of the strongest pieces of evidence, and I don't think you'll see any mention of it anywhere in Mr. Tyler's briefs, is this meeting in March of 2016 between Mr. Tyler and the undisputed architect of the conspiracy, Robert O'Neill. And they're talking about the Stanford deal. And interestingly, Mr. Tyler in his brief says, well, Joanna Shore and Matthew Tyler didn't need to be joined at the hip. There are scheduling conflicts and people, executives can't attend all the same meetings. That's a perfectly legitimate point, except they both went down to this meeting together. And at the moment Joanna Shore goes to the other side of Robert O'Neill's clinic, that's when Matthew Tyler decides that it's a good time to talk about the Stanford agreement and about bringing more hospitals on board and about he appreciates working with the relationship and their stock has gone sky high. And they need a storyline. It's hard to imagine. Again, maybe there's some innocent explanation for creating a storyline, but there's a guilty explanation for that, too, especially when he's in a meeting behind Joanna Shore's back talking to the architect of the conspiracy. So there are guilty inferences from that. They become even more powerful when you start looking at the other emails that he sent outside of Joanna Shore's presence. Again, there's no scheduling conflict with emails. If he wants to include Joanna Shore in the email, it doesn't matter where she is at that time. So he doesn't include her, for example, on the email about let's talk about next steps after the Stanford agreement is signed. If I could, I think I would turn to, if there are no specific questions about specific events or evidence with respect to Hertzberg and Tyler, I would turn to Mr. Hardaway's sufficiency claims, which are, I think, slightly different but fail for somewhat the same reasons. He says that, and I think today is the first time, I think, that I've understood him to actually state the Shaw standard correctly, which is that he had to know that referrals, that the referrals in this case were the test holders, could be paid for, could be paid for by federal programs. And so I think that correctly states the Shaw standard. And so under the Shaw standard, the two pieces of evidence we have, we have more than that, but I think the two really, the highlight pieces of evidence we have about that are in April of 2015, Greg Hardaway sends an email to Jeff Craven. And this April of 2015 is an important date because that's when Little River and Boston Heart signed their agreement, their client bill agreement. And this email to Jeff Craven, he says, they, and the email is titled LR, Little River, they plan to use the C panel and the M panel. And attached to the email are Boston Heart requisition forms. So this isn't just the M panel, the Medicare panel, and some other context having nothing to do with Boston Heart. This is Little River and Boston Heart. Little River plans to use Boston Heart's Medicare panel. That's strong evidence that these could be funded by federal programs. And in fact, given the fact that they were funded by federal programs, and given the fact that Greg Hardaway was the on-the-ground salesman in Texas who was involved in this from the very beginning and brought Little River to Boston Heart from the very beginning, and I think knew, I think this email from Jonathan Scheinberg to Susan Hertzberg at the outset of the conspiracy was, I believe that maybe Hardaway wasn't on that. But from the very beginning, Little River was looking to leverage its quote, great contracts. Those great contracts included commercial insurers, but they also included the federal government. And then, of course, there's this text between, and this is the thing about Greg Hardaway, he kind of sees every angle of this conspiracy. He works with Little River. He's a salesman at Boston Heart. He's the salesman at Boston Heart who brought this deal to the company. He gets double commissions. I'm misstating that. He's getting enhanced commissions at Boston Heart because he brought this deal there. He's double dipping, however, because he's getting paid from his own MSO, RISE MSO. Little River is paying RISE MSO. So he's seeing various angles of this scheme. And I think, just to refer back to his general knowledge about the scheme, not so much the federal piece, but just the general knowledge piece, there's Mr. Mariani's testimony. And Mr. Hardaway's counsel referred to it. But I don't think, and I mean, it's great that it's been acknowledged, but it's also, I think, impossible to get around on appeal. This is 8260 to 8265 of the record is the crucial piece of Reuben Mariani's testimony where he says, Greg Hardaway knew that my MSO, which was next level, I think, was paying MSOs. He knew that those payments were intended to induce referrals. I'm paraphrasing, but it's very close to that. And the way he says, well, that's just not credible. Reuben Mariani can't be believed. Well, the jury could believe him. That's what this court's case law says, that juries are entitled to credit. And Reuben Mariani was a cooperator, but cooperators can be believed, especially when their testimony makes sense in light of the record as a whole, which it does here. Now, Mr. Hardaway, one of the reasons he says Mr. Mariani couldn't be believed was because it was outside of his powers of observation to have this conversation with Greg Hardaway. I think counsel mentioned that the agent said, well, I found no emails between them or talking about this sort of thing. That's true, and there's an explanation for that. At 8513 to 8515 of the record, on cross-examination of Mariani, Hardaway's counsel elicited from Mariani that they didn't exchange emails, and they didn't talk regularly. They weren't always speaking, but they did speak. And they did speak about, obviously, this matter, and they spoke about onboarding them. And Greg Hardaway was involved in the onboarding process. Onboarding, in the context of this scheme, meant signing up a physician. Signing up a physician, they were the ones who were investing, or quote, unquote, investing. So it's natural for this to have come up at the time. And Mr. Hardaway states cases Booker and Kieffer in his reply brief about when the appellate court and just sort of set aside the jury's credibility determination. Those cases mention the standard, but then do not apply it, do not invoke it. And I don't know that Mr. Hardaway, I don't think he cited a case where it's been invoked. I don't think it should be invoked here. There's certainly nothing physically impossible about this conversation happening. I think then I will, unless there are questions about Hardaway's mens rea and on the federal nexus requirements. Well, I meant to actually follow up on one last point about the knowledge of the federal nexus and the possibility of federal reimbursement. And that's that text between, and this is also in April of 2015. So again, right after the agreement is signed between Little River and Boston Heart, their Greg Hardaway is texting Jeffrey Madison, the CEO of Little River, and saying, I would like to talk about insurance, how you guys are going to build this. And then, of course, the next month, David Krauss emails Greg Hardaway and says, I would like to know, Greg, how Little River is working with Medicare patients, which presupposes two things. One, Little River is working with Medicare patients. And two, Greg Hardaway knows that's how Little River is working with Medicare patients and knows that they do. And in fact, they were. Again, there's this kind of underlying threat of this. There's this objective truth that's happening underneath all this. And the question is, what do the defendants know about it? And we see various emails and texts where that knowledge is reflected. Turning to Mr. Krauss' jury note claims, Judge Smithy raised the question of whether this was timely raised. In our view, it wasn't, because there was an opportunity. Albeit, I mean, it was not the easiest opportunity, but there was an opportunity the moment note four was disclosed before the jury returned the verdict. So there was time. And the district court not only disclosed the note, but disclosed the fact that it was related to Juror 12. So were they identical notes? No. But that is, was this an identical note? Was note four identical to note three? It was not identical. And counsel has mentioned the ways in which it differed. But it was about the very same subject. In our view, it was very similar. But they were on notice that it involved Juror Number 12. They could have asked, Your Honor, you've said that this is a very similar note. We would like to know what it says so that we can object or not, as the case may be. This is just too important to let this go by the boards. And I would say, too, to us, this thing about he would hang the jury because of his moral compass. He says that because of his moral compass, he can't be open-minded, which is the same problem. I think, Judge Oldham, you alluded to this. The problem noted in note three was he won't change his mind. He's unwilling to change his mind based on the instructions and the evidence, which is a juror who's not deliberating at that point. And then note four, had note four been disclosed right when it was given, which was 35 minutes later, his moral compass would not allow him to be open-minded. So nothing has changed. It's not as though he's suddenly realized that now he's fully reached a verdict, and he's concluded based on the evidence and the instructions that his moral compass won't allow him to convict. His moral compass won't allow him to be open-minded. So it's the same problem as before. So we think there was an opportunity to object. We've also cited a case, and this is called Strach, S-T-R-A-A-C-H, in our brief, in the jury note portion of our brief. We haven't highlighted this part of the case, but it is part of the same analysis, the jury note analysis. And a verdict is not final until it's final. I mean, until it is reported in court, the jury has to hand it over to the judge. If there's a poll taken, at that point, and Strach also cites Rule 31, Rule 31 is the rule that says if a juror dissents during a poll, the judge can declare a mistrial. And if the juror gets up and says, no, you know what? This is not my verdict at all, the judge at that point can declare a mistrial or even instruct the jury to go back and deliberate some more. So in this case, I mean, I think we all tend to think that, well, the jury was about to come into the courtroom. It's so close to the end, but there's still things that can be done at that point had the defendants thought that that was a necessary step to take, to ask what the instruction said, how it related to Note 3, will some further instruction, should some further instruction be given. And so in our view, the standard is plain error. And I don't think the defendants can meet that standard, the obviousness portion of that standard, particularly because of the cases they cite from this court are response cases. Counsel, can we back up for just a second? I want to walk through the timeline and make sure I get it. So Note 4 comes in at 11.30 on November 29th? Yeah, day 22, I believe. I don't know the dates, I guess. Second day? Delivery? Yes, correct. But it's at 11.30 in the morning. That's really all that I'm really focused on at the moment. What does the jury do for the rest of the day? They deliberate. So how, if the defendants don't know that there's not one note, but two notes, and they don't know that juror number 12 is threatening to hang the jury, they don't find that out until after the end of the trial. Isn't there a significant difference between one note that says, gosh, I'm sort of hung up on this, and a second note that comes in 35 minutes later that's hanging over the deliberations for the rest of the day, and they don't even find out about it until, I mean, I'm assuming the jury's also deliberating on the 30th from 9 AM until 11.30, when the district court discloses the Note 4. Is that right? I mean, that's almost an entire 24 hours or whole business day of deliberations. Right. The defendants have no idea that the note's out there. But I actually think that cuts against the defendants in the sense that the problem that they have with not getting a chance to respond was that they were going to say that a response would need to include balancing language that the response to Note 3 didn't include. Except a couple points about that is, one is that the objectionable, the allegedly objectionable language in the response to Note 3 was, you know, deliberate in good faith until you reach a unanimous decision. There's a couple things about that, too. One is that that ignores that the court referred back to the original instructions, which included a, don't give up your honest and held beliefs. But also, that was in the response to Note 3 to which the defendants didn't object. So they didn't find that language objectionable to begin with. I mean, if that was their objection, they were going to say they were going to raise that objection had they known about Note 4. They knew about that at the time of Note 3. Yeah, but at the end of the day, two notes is different than one. And the content is slightly different. I understand it's on the same juror. I understand it's roughly. You can argue that the explanation about the moral compass is just an explanation for what I meant 35 minutes earlier in Note 3. But as you probably know, I'm as big of a plain error hawk as you'll find. But the whole point of plain error is that we don't want people sleeping on the right, lying behind a wall, and then springing something later for the first time, either on appeal or never getting it to the district judge. It seemed quite odd to me to say plain error applies when the defendants went 24 hours without even knowing that the note existed. There's a whole separate problem about knowing what the contents of it are. You can understand, I think, that it would affect trial strategy. It's obviously a multi-defendant trial. You've got all sorts of different lawyers in the room. How are we going to respond to two notes versus one note as a significant decision? And it's sort of hard to say that they should be faulted for plain error for not coming forward sooner to say. And they went 24 hours in total ignorance. Right. Well, I would say at bottom, I think their claim is that they wanted to ensure, they wanted to protect against a coerced jury. One way or the other, they wanted to protect against a coerced jury. And their input would have related to that, whatever their input would have been, if they would have objected or not. The district court didn't think that they would have objected anyway, given the similarity, given that this was on the heels of the response to note three. But if the concern is coercion, I think the record, whether it's under a third prong or fourth prong prejudice unfairness analysis, or whether it's under this was to be reviewed in over abuse of discretion, so that it's a harmlessness analysis. Either way, I think the right to an uncoerced jury was protected, as reflected by how long it took the jury to return a verdict. As Your Honor pointed out, it was 24 hours real time over seven hours of deliberation. So for those reasons, even if the court were to find error, be it in a presence sense, or be it in the Mr. Krause's kind of attack on the substance of the response to note three, either way, this jury was uncoerced. I think Sylvester is actually a good case for us on this, on the harmlessness piece. In Sylvester, the court referred back to its initial instructions, as the court did here. The jury did take, in that case, it deliberation time after the response. In this case, it was seven hours. And so I think for all those reasons, if there was error at all, it was non-prejudicial, non-reversible error. Counsel, let me ask you this. As one victim of having tried a few hundred juror cases, one of the typical responses of a district court judge when the verdict comes in, where you say, no, it's whatever, publish the verdict, and turn to the jury and say, so say all of you. And it looks great that the jury speaks up. And there'd be no silence. And if there's no silence, then he takes it. But in other words, he gives another opportunity to the jury to, for some reason, someone is not really on board on that. In other words, he doesn't close it until the jury has the direct question. So say all of you. And I don't recall that exchange here. So when the verdict was brought in on day, it was day 23. So the jury was seated at 1127 AM. I'm sorry. Speak a little more slowly. I'm sorry. So on day 23, the jury was seated at 1127. And I think the way the verdict happened was that it was the standard way. The district court said to the foreperson, have you reached a verdict? And the foreperson said yes. And I think individually, the court pulled each individual juror. That's what I'm asking. Yeah, I believe that did occur. I think that's in the transcript. And specifically, I think the question was, is this your verdict? And each juror, it's not reflected in the transcript, but it's reflected in the post-trial order where the court says each juror stood and gave that response. And juror 12, there's nothing in the transcript that would suggest that juror 12 was holding out or didn't agree with the verdict. If there are no further questions, we would just ask your honors to affirm for the reasons stated in our briefing today. All right, thank you. Thank you. All right, so for rebuttal, I noticed that all four of you, I don't think any of you used all of your opening time. You restricted yourself to two or three minutes. So I'm going to allow everyone to have three minutes. But please don't just repeat what you've already told us. And don't tell us what you're going to tell us and then tell it to us. That's not very useful. But let's do three minutes for each of you. Thank you, your honor. And I will try to adhere to those instructions. A few quick points of rebuttal. The table stakes here are for Ms. Hertzberg. For Ms. Hertzberg, the government had the benefit of eight cooperating witnesses. None of them said she did it. They said she hid it. So where? They said they hid the conspiracy from her. Those are the table stakes for Ms. Hertzberg. So where does that leave the government to go? Judge Hickenlop, you said there was a lot of money in this case, a lot of money in this case. We can debate whether or not how much money it was. But here is the key point. Ms. Schor, who Ms. Hertzberg appointed to oversee hospitals, had questions. Ms. Hertzberg had questions. In October and November and December of 2015, Ms. Schor spoke with Little River on Ms. Hertzberg's behalf, assessed the billing practices and the MSO operations of Little River, and reported back to Ms. Hertzberg it was a sound business model. Ms. Schor said she never suspected kickbacks, never suspected kickbacks. Ms. Schor got it wrong. Ms. Hertzberg got it wrong. But that does not mean that they are conspirators. In fact, it shows the opposite. Counsel, what's the innocent explanation for a 30-bed rural hospital operating in Traylor's comprising 25% of BHT's revenue? Absolutely, Your Honor, because 30 beds isn't the relevant number here. It is allowable, and the head of compliance, Rossi, explains this as well, allowable for a rural hospital to have a network of physicians, including in big places like Houston or whatever. That's a policy decision that allows little hospitals like Little River to get revenue so they can provide services in rural areas. Everyone understood that this network was not just out there in the small hospital, bigger network, and when I say everybody, I mean everybody, the GC, the board, all of this information about the financials was understood and well-known. So when you say follow the money, they did follow the money, and they thought it was a sound business model from a non-conspirator saying this who was the government's witness. Judge Smith, I believe you asked, so what is it precisely about these MSOs that makes them illegal? And I don't think I heard an answer to that. Yeah, well, you know who else didn't hear an answer to that was Ms. Hertzberg, because Krauss, as the government argued in closing, hid the key point, which is that these MSOs were paying the doctors. That is illegal. That is illegal, and that's exactly what the conspirators, and this is undisputed, this is the government's argument, this is the closing of this case. How do you know Krauss is guilty? Because he hid the doctor payments, the payments to the doctors from Ms. Hertzberg. MSOs... Your rebuttal time has expired. MSOs are lawful, and that's what Mr. Ross has concluded. Thank you very much. We'd ask you to reverse. Mr. Geisler. Thank you, Your Honor. I'll jump right in. The government says that the wrong type of doctors were ordered to test. We explain this on page 14 of our reply brief. The government's ignoring it yet again. I'd encourage you to look at 4551 to 4552 of the record. You'll see this email. Mr. Tyler himself flagged this as a concern, demanded explanations, and passed on cogent explanations at the chain of command. I have no idea how that constitutes evidence of a conspiracy. The government crossed out again that don't send me emails about MSOs from their cooperating witness, Jeff Parnell. Parnell admitted this was speculation. He had no idea why he was supposedly told this. It was a random aside in a hall and in a parking lot. It wasn't this concerted effort to say, let's make sure we keep this quiet. It was a statement that Parnell himself didn't understand, and Parnell himself admitted that the government's own answer to this is irrational, because Mr. Tyler was including emails about MSOs before and after that event, including demanding explanations about SMOs, about asking who are MSOs supplying the doctors for the hospital's relationships. The government again points out the emails about the data from Little River being shared too openly within the organization. Joanna Shore was copied on that email. So under the government's view, Tyler was hiding the conspiracy by copying non-conspirators and saying, let's try to shield this information with people outside the conspiracy involved in the chain. The legitimate explanation is obvious. This is a major client that was expressing deep concern that confidential sales data was being exposed to market gossip, and the VP of sales would be deeply concerned about preserving those relationships with those clients. The government says, and Jeff Smith, you haven't gotten an answer about what's wrong with MSOs. The only thing wrong with an MSO is if they're providing kickbacks. They can have doctors investing, they can return ordinary dividends to a doctor based on their investment, just not based on their using kickbacks for specific services. So the email that said that MSOs aren't providing specific administrative services, that's fine, they can simply recruit. And I think if you look at that email, and this is on page 4347 of the record, I think you'll get a good sense of what the government's doing in this case. My friend constantly points out this email because they like the word, it doesn't pass the SNF test. And that sounds pretty damning, saying we're concerned that the activities in passing the SNF test, and could you read the surrounding sentence? The concern was regulatory compliance by not having actual physical locations in the areas where doctors are ordering tests. That has to do with the concern that you were raising earlier, Judge Jigabatham, which is not an issue in this case. It has absolutely nothing to do with kickbacks. The final thing I'll point out, and this is with O'Neill, Joe and Shaw were not excluded from these meetings. The government has managed to find, in the course of weeks and months of internal communication, isolated instances where Shaw happened not to be copied on communications, even though Shaw was a direct participant in key conversations with O'Neill. The government, again, had no explanation for why a non-conspirator was included in the supposed conspiring conversations. All right, thank you, Mr. Gosch. Thank you. Mr. Coburn? Thank you, judges. Just to address a few points the government made. First, you know, we would just, you know, kind of add to what Judge Smith had responded to the question about the MSOs. Really, you know, it's incredible that the government states that Mr. Hardaway was somehow able to see the conspiracy from all the angles here. In fact, Mr. Hardaway had no exposure to the central issue, which is exactly the same issue as this court identified in Marchetti, which is what was the conversation between the MSOs and the referrers? If there's something that makes the MSOs illegal, it's the fact that of illegal kickbacks, which is the quid pro quo, referrals in exchange for money. Mr. Hardaway had no insight into that. The government suggests, and we mentioned it in our brief during today's opening, that there was no, you know, that the agent, the case agent here himself testified that there were no communications between Mr. Hardaway and the operators of the criminal MSOs. The government got up here and said that that had something to do with e-mails or e-mail reviews. If you're honored to look at the record at 11-474-75, the agent specifically testified, and I'll just quote part of it, but you can look at the entirety of it. While we're talking about Ascend, which is one of the criminal MSOs, during the course of your investigation agent hearing, did you see any evidence connecting Mr. Hardaway to Robert O'Neill? Answer, I don't believe I saw any communication between those two. And it goes on as well. I want to just turn briefly to Shaw because the government continually misstates the standard of Shaw. We acknowledge in this case that Mr. Hardaway knew that samples were being sent by doctors to Little River that were federally paid. But Shaw requires more than that. It's a nuance that the government continually just overlooks. The knowledge has to be that those federal paying patients were among those for whom payments were made to the doctors. In other words, the government had to show that Mr. Hardaway knew that those patients being referred and for which payments were made that those were federally insured patients. Not merely that federal patients were somehow being sent from one to the other. But there's no requirement of actual awareness of fraudulent billing to Medicare or Medicaid in Shaw. That's page 352 of Shaw. There has to be awareness that the patients for whom payments for whom there was a quid pro quo for whom their kickbacks were being paid were federally insured. Here, Mr. Hardaway had every reason to know exactly the opposite. I see that my time has expired, but I just finished the answer. Here, Mr. Hardaway, the contract carved out federally insured patients and all the testimony was that there was no payment for federally insured patients. It's not enough simply to say that Mr. Hardaway knew that that little river that samples were being sent for federal pay patients. All right, thank you, Mr. Pilgrim. Thank you. Okay, Mr. Ansley, I'll raise that point high enough and we have two other cases today so they're going to want that out. I'll get it ready for them, Judge. Thank you very much. Thank you. May it please the Court. If the trial court's response is deemed to be a response to Notes 3 and Notes 4, it was an improper response under Vax. It was responded to, Note 4, without telling the parties about it. It resulted in a coercive, partial balance charge to the jury that was improper because the jury was not told to adhere to its conscientious beliefs, was not told also that it's permissible to mistry the case. Those things were not told to the jury after Note 4 was issued. The response was a response to Notes 3 and Notes 4. The timing, as we spoke earlier, demonstrates that. There were no follow-up questions from the jury after sending Note 4. If it did not determine the court's response to be a response to Note 4, there reasonably would have been follow-up questions. Why didn't the court instruct this regarding Note 4? There were no follow-ups. And the content of what was given to the jury actually changed. The court spoke, confirmed that the parties who agreed to a response to Note 3 did not include the phrase in good faith as far as deliberating. The court then, after receiving Note 4, included or added those words in good faith after deliberating. After receiving Note 4 and without discussing that with the parties, that further indicates that the response was, in fact, a response to both of those notes. We did not have the opportunity to object. And because of that, that's error. It requires de novo review. I want to talk about the timeline. Judge Oldham, you were asking earlier about the exact timeline of these notes. The court instructed the jury at 1135 on November 29th to continue deliberating. At 1130, the next day, November 30th, almost 24 hours later, the jury came back with convictions of all defendants. The jury had almost 24 hours and hours of deliberations on the 29th afternoon, the morning of the 30th to merit it, with the instruction, improper, to continue deliberating until you reach the unanimous verdict. That, in fact, resulted in the convictions that we have here, because the jury was not told for that time period what would have been an appropriate instruction, an instruction that we would have asked for if we had known about the content of the existence and the content of Note 4. If we did, and it's mistaken to say that we would not have objected. The government tries that both ways in its briefing. It says that the parties are presumed to have objected if they thought there was an issue, but in other places they say that they assumed we would object, specifically here. We absolutely would have objected. All the parties would. We would have asked for a full Allen charge, which after Note 4 we would have been entitled to under Bass, and I believe it would have been error not to give a full Allen charge after Note 4. We would have asked for a mistrial. We would have asked that the judge directly respond to Note 4. Your time has expired, Mr. Hensley, and your case is under submission. Thank you. Mr. Bass, United States vs. Hackney.